COURT OF APPEALS









COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL
PASO, TEXAS

 

FRANK W. CASS and MICHAEL L.
CASS,      )

                                                                              )

Appellants,                         )

                                                                              )              
No.  08-97-00582-CV

v.                                                                           )

                                                                              )                    Appeal from the

PATRICIA LOVE STEPHENS,
Individually         )

and as Trustee of the WALTER
H. STEPHENS    )                112th District
Court

TRUST, the SSH TRUST, the
SUTTON               )

ELIZABETH STEPHENS
IRREVOCABLE         )           
of Reagan County, Texas

TRUST, and the HEATHER LOVE                       )

STEPHENS IRREVOCABLE TRUST,                 )                        (TC#
371)

                                                                              )

Appellees.                          )

                                                                              )

 

 

O
P I N I O N

 








This is an oil and
gas accounting case.  Plaintiffs,
Patricia Love Stephens, individually and as Trustee of the Walter H. Stephens
Trust, the SSH Trust, the Sutton Elizabeth Stephens Irrevocable Trust, and the
Heather Love Stephens Irrevocable Trust (collectively AStephens@), were working interest owners of
certain oil and gas wells operated by the defendants Frank W. Cass,
individually and d/b/a Cass Oil Company, Michael L. Cass, William G. Cass, and
Cass Oil Company, Inc.  Stephens sued the
Cass defendants for breach of contract, conversion, and fraud.   The Casses counterclaimed for breach of
contract and defamation.  A jury returned
findings in favor of Stephens, finding Frank Cass, individually, liable for
breach of contract, conversion, and fraud, and finding Michael Cass liable for
conversion.  The jury found against the Cass
defendants on their counterclaims.  The
trial court entered judgment on the jury=s
verdict.  On appeal, Frank and Michael
Cass raise numerous points of error attacking the testimony of Stephens= expert witness, the legal and factual
sufficiency of the evidence to support the jury=s
findings, and the trial court=s
imposition of sanctions for discovery abuses. 
We affirm and reform.

SUMMARY
OF THE EVIDENCE 

In 1970, General
Walter H. Stephens and Frank W. Cass formed an operating partnership known as
Stephens & Cass.  The partnership
operated properties which General Stephens and Frank Cass acquired individually.  From 1970 to 1977, the partnership
successfully drilled and operated approximately sixty to seventy wells located
in Reagan, Upton, Glassock, and Midland Counties.

In 1974, General
Stephens= health
began to decline.  He suffered a broken
hip and had to have surgery.  Over the
next two years, he had three more surgeries on his hip and eventually had to
have his hip replaced.  It appears that
during this period, General Stephens was not able to meaningfully participate
in the daily activities of the partnership. 
By late 1977, Frank Cass desired to terminate his relationship with
General Stephens and bring his son Michael L. Cass into the business.








On October 1,
1977, General Stephens and Frank Cass entered into an AAgreement
to Terminate@ the
partnership.  By this agreement, the two
men agreed to wind up the business by January 1, 1978.  They further agreed:  to notify all of the other joint interest
owners that Stephens & Cass had agreed to terminate their obligation as
operator under the joint operating agreements (AJOAs@); that Mr. Cass would attempt to
succeed the partnership as operator; that if Mr. Cass succeeded in obtaining
the necessary votes under the JOAs, he would continue to operate the wells
pursuant to the existing agreements; that Stephens & Cass would marshal and
inventory all personal property owned by the partnership so that it could be
valued; and finally that the records of Stephens & Cass would remain the
property of both men and would be available to either one as required.  

Pursuant to the
foregoing agreement and the various JOAs, formal written ballots were
administered, and Mr. Cass was elected operator by a majority-in-interest of
the well owners.  On January 1, 1978, Mr.
Cass and the General entered into a new operating agreement recognizing that
Mr. Cass had been elected operator.  In
1980, Mr. Cass and General Stephens reached an agreement and assigned values to
the personal property which they jointly owned.

In January of
1979, the General slipped on a patch of ice outside his home and suffered a
broken back.  The General=s wife, Patricia Stephens, took him to
the hospital.  Apparently, he became
over-medicated and slipped into a coma while at the hospital.  His air supply was cut off for a period of
time.  The General eventually recovered,
but developed a condition known as Pickwickian Syndrome which caused him to
sleep excessively.  Mrs. Stephens
testified that her husband slept almost twenty hours a day from 1979 until his
death in 1984.  During this time, the
General was unable to handle the vast majority of his financial affairs.  Mrs. Stephens helped pay bills, but she
testified that much of her husband=s
mail went unopened and that he failed to pay taxes for three years before his
death. 








After he became
operator of the jointly-owned wells, Frank Cass threatened to resign on a
number of occasions.  He did so because
he was discouraged by the working interest owners=
failure to timely pay their monthly joint interest bills (AJIBs@).  Mr. Cass related that he was being forced to
put up his own money to pay vendors of the wells, and was losing money as the
operator.  In 1979, he sent a letter to
all working interest owners stating that he was resigning as operator under the
JOAs.  The JOAs allowed an operator to
resign, stating that all parties to the contract shall select by majority vote
in interest a new operator.  Nothing more
was done or said about Mr. Cass=s
resignation and he continued to operate the wells for another three years.  In 1982, Mr. Cass sent a letter notifying the
working interest owners that he was changing the operator=s name from his own to Cass Oil
Company, Inc.  From that point forward,
all the working interest owners made their checks payable to Cass Oil Company,
Inc., instead of Frank Cass.

On November 14,
1983, Mr. Cass purchased certain undeveloped lease-hold acreage from General
Stephens.  These undrilled locations were
on the same leases as the jointly-owned wells (Athe
Stephens wells@) and
were direct offsets to them.  The General
passed away a few months after he executed those assignments.  After the General died, his properties passed
to Mrs. Stephens, the Walter H. Stephens Trust, the SSH Trust, the Sutton
Elizabeth Stephens Irrevocable Trust, and the Heather Love Stephens Irrevocable
Trust.  In 1984, solely-owned Cass wells
were drilled on the offset locations (Athe
Cass companion wells@).








In March of 1986,
Mr. Cass sent Mrs. Stephens a letter proposing to shut in twenty-six of the
Stephens=
wells.  Mrs. Stephens contacted Bob
Franklin, an engineer who had appraised the wells for estate tax purposes
following the General=s
death.  Based on Mr. Franklin=s advice, Mrs. Stephens wrote a letter
asking Mr. Cass to show on a lease-by-lease basis how the leases would be held
without production.  In response, Mr.
Cass called Mrs. Stephens and allegedly became very belligerent.  Mrs. Stephens related that her conversation
with Mr. Cass lasted for three hours, and that he was evasive and
insulting.  He told Mrs. Stephens that
she did not know what she was talking about and neither did her engineer, her
CPA, or her estate attorney.

Concerned that Mr.
Cass was withholding information, Mrs. Stephens hired Gruy Petroleum Management
Company (AGruy@) to conduct an audit of the revenue
and expenses of the jointly-owned wells (Athe
Gruy audit@).  She also hired a private investigator who
recommended that she conduct a Atrash
cover@--a
routine pick up of Cass Oil Company=s
trash.  The Gruy audit resulted in
separate reports for revenue and expenses. 
The audit was limited in scope and time; it covered revenue and expenses
from 1984 to 1986.  It reported major discrepancies,
$2.9 million in expense exceptions and $9 million in revenue exceptions.

Pretrial
Matters

Mrs. Stephens
received the reports from Gruy in September of 1986.  She then mailed copies to other working
interest owners who had a financial stake in the wells.  Mrs. Stephens filed suit against the Casses
on November 4, 1986.  Her petition
alleged among other things that the Casses had breached the JOAs, converted
jointly-owned property, and committed fraud. 
The Casses answered, denied the allegations, and counterclaimed against
Mrs. Stephens for failure to pay her joint interest bills. 








The first 1,000
pages of the clerk=s record
reflect a long and tortuous discovery battle. 
In July 1987, Stephens filed her first discovery request, seeking
production of numerous documents.  Over
the ensuing months, a number of discovery hearings were held by the court and
several orders were entered to compel discovery.  Over the period from the actual commencement of
discovery until May 1988, Cass produced and Stephens copied approximately
200,000 documents.  In January 1988,
Stephens filed a motion to compel further production and prevent destruction of
documents.  Also in January, Cass amended
their answer asserting new and additional counterclaims against Stephens and
against Gruy, which was impleaded as a third‑party defendant.  Damages were sought against Stephens and
against Gruy, for negligently or intentionally conducting an improper audit and
publishing a false report.

In May 1988, a
hearing was held on various motions for protective orders.  There it was revealed for the first time that
Stephens, through her investigators, had recovered between 150,000 to 200,000
documents from Cass Oil Company=s
trash.  The Atrash
cover@
testimony indicated that Mr. Cass had been systematically discarding
potentially discoverable documents both before and after the filing of the
lawsuit.  Entire original files were
thrown out, including the pump installation and well development files which
were necessary to audit the joint interest accounts and to trace the movement
of jointly-owned equipment.  Mr. Cass
even tore up and discarded the only signed copy of the original operating
agreement. 








In June of 1988,
Stephens moved for sanctions against the Cass defendants for their repeated
discovery abuses.  The trial court set a
hearing for September 12, 1988.  The
Casses then filed a motion to exclude or suppress the trash documents.  The hearing on the motion for sanctions and
the motion to exclude or suppress evidence started on September 12, and lasted
eight days.  On November 1, 1988, the
trial court denied the Casses motion to exclude or suppress the trash
documents.  On November 7, 1988, the
hearing on the motion for sanctions resumed and continued for four days during
that month.  The hearing resumed on April
3, 1989, and continued for eight days. 
Closing arguments were held on October 23, 1989.  The trial court rendered an order imposing
sanctions against the Casses on May 7, 1990. 
Among other things, the trial court=s
order struck the Cass defendants=
answers, dismissed with prejudice the counterclaims, and entered a default
judgment as to liability against them. 
All told, the hearing on the motion for sanctions lasted twenty-one
days, involved more than eighty witnesses, and covers over 4,000 pages of
reporter=s record.

Appeal was taken
to our Court.  We dismissed for lack of
jurisdiction holding that the trial court=s
order was not a final judgment and not appealable.  See Cass v. Stephens, 823 S.W.2d 731,
734 (Tex.App.--El Paso 1992, no writ). 
In dismissing the cause, we suggested that the trial court reconsider
its decision under the Texas Supreme Court=s
holdings in TransAmerican National Gas Corp. v. Powell, 811 S.W.2d 913
(Tex. 1991) and Braden v. Downey, 811 S.W.2d 922 (Tex. 1991).  In November of 1993, pretrial matters were
resumed.  For the next thirteen months
the parties continued the discovery process. 
In January of 1995, the Casses filed a number of motions for summary
judgment based on limitations.  In
February, the Casses moved to disqualify Stephens=
expert witness, Harold Eldridge. 
Stephens responded to the motions. 
On August 28, 1995, a hearing was held on the motion to disqualify
Stephens=
expert.  The hearing lasted for two
days.  On September 5, 1995, the trial
court denied the motion.

In November of
1995, the Casses moved for summary judgment on approximately seven different
issues in the case.  Stephens responded
to the motions.  The trial court denied
the motions for summary judgment on March 18, 1996.  Trial was then set for February 10,
1997.  The Casses=
attorney withdrew on November 5, 1996. 
The case was continued, and a new trial date was set for May 19,
1997.  The Casses=
new counsel did not appear until May 5, 1997. 

 








The
Trial

The case went to
trial on May 27, 1997, and was tried over the course of the next five weeks,
finally ending on June 26, 1997. 
Stephens put on evidence showing that Frank Cass was the operator of the
wells and that Cass Oil Company, Inc., was never elected operator or,
alternatively, was the alter ego of Frank Cass. 
Harold Eldridge, Stephens=
accounting expert, explained the evidence supporting the allegations against
the Casses.  He testified that the
documentary evidence showed Frank Cass: 
made unauthorized expense charges on the 

jointly-owned Stephens= wells; overcharged expenses to the
Stephens= wells;
repeatedly charged expenses incurred on the Cass companion wells to the
Stephens= wells;
often made the joint owners of the Stephens=
wells pay for equipment they already owned; and finally converted jointly-owned
equipment for use on the Cass companion wells without issuing any credit to the
joint interest owners of the Stephens=
wells.  Numerous witnesses established
that Frank Cass had thrown away thousands of documents which were necessary to
audit the expenses incurred on the Stephens=
wells, and to trace the movement of equipment from one well to another.

Mr. Eldridge=s five volume report was admitted into
evidence.  The report summarized his
testimony and shows on a per well basis his conclusions regarding the joint
interest accounts.  Stephens also
admitted into evidence the report compiled by the Cass Defendants= accounting expert, Mr. David
McKinnon.  Stephens showed that Mr.
McKinnon agreed with some of Mr. Eldridge=s
conclusions.  In addition, hundreds of
documents were admitted into evidence in support of Mr. Eldridge=s report.  The documents consist of material transfer
invoices, well development files, operating agreements, the Agreement to
Terminate, and various other documents.








The Cass
Defendants put on evidence attempting to show that Cass Oil Company, Inc. was
the operator of the wells.  Counsel for
the defendants repeatedly asserted that Mr. Eldridge=s
conclusions were not trustworthy and were biased in favor of Stephens.  The Cass Defendants stated that the testimony
and conclusions of its own accounting expert, Mr. David McKinnon, were more
reliable.  Portions of McKinnon=s deposition were read into the
record.  The Cass Defendants also put on
evidence showing that Stephens had not paid a portion of her 1986-87 joint
interest billing and, thus, owed them money. 
Both Frank and Michael Cass maintained that Mr. Eldridge=s conclusion were incorrect, that they
had done nothing wrong, and that both Gruy and Mrs. Stephens had slandered
them.

The
Jury=s Verdict


The jury
considered the evidence and returned a verdict in favor of Stephens and against
Frank and Michael Cass.  Specifically,
the jury found:  that Frank Cass was the
operator of the wells; that Cass Oil Company, Inc. was also the alter ego of
Frank Cass; that Frank Cass had breached the operating agreements; that he had
fraudulently concealed his breach; that Frank Cass committed common-law fraud
by charging Stephens for goods and services that were never furnished to the
Stephens= wells;
that Frank and Michael Cass converted jointly-owned property for their own
personal benefit; that Stephens had not breached the operating agreements; and
that she had not defamed the Cass defendants.








The jury awarded
Stephens:  $317,905.59 as breach of
contract damages accruing during the limitations period; $268,256.58 as breach
of contract damages accruing outside the limitations period, but recoverable
because of a fraudulent concealment finding; $68,136.69 as fraud damages
accruing during the applicable limitations period; $33,164.23 as fraud accruing
outside the limitations period, but recoverable because of a discovery rule
finding; $14,070.38 as conversion damages accruing during the applicable limitations
period; $84,710.44 as conversion damages outside the limitations period, but
recoverable because of a discovery rule finding; $1,400,000 in attorney=s fees for preparation of the breach of
contract claim; $100,000 for an appeal to this Court; $50,000 for an appeal to
the Texas Supreme Court; and $25,000 if a writ of error is granted by the Texas
Supreme Court.

Exemplary
Damages

The jury heard
additional testimony from Sutton and Patricia Stephens regarding the toll that
the years of litigation had taken on them. 
The jury also heard from Frank, Michael, and Gregory Cass.  Frank Cass asserted that he had exhausted his
resources in defending the lawsuit and was strapped by debt.  He specifically denied transferring any of
his assets to his other family members in order to become judgment proof.  Michael Cass testified in much the same vein,
maintaining that he had no money despite being president of a publicly traded
petroleum corporation.  The jury was
charged and later returned with a verdict awarding damages to Stephens.  The jury awarded Stephens $5 and $15 million
against Frank Cass for committing common-law fraud and conversion,
respectively.  The jury then awarded
Stephens $20 million against Michael Cass for his conversion of jointly-owned
property.

Post
Trial Matters








The Casses moved
for judgment notwithstanding the verdict (Ajnov@). 
The trial court denied the motion and entered judgment on the jury=s verdict.  The trial court=s
award included an additional $978,492.10 as a monetary sanction against Frank
Cass for his discovery abuses.  Frank and
Michael Cass filed individual motions for new trial.  The trial court overruled the motions by
written order.  Stephens voluntarily
remitted $15 million of the awards against Frank Cass--$2.5 million of the
fraud award and $12.5 million of the conversion award.  Stephens also voluntarily remitted $17.5
million of the award against Michael Cass. 
Frank and Michael Cass timely filed separate notices of appeal and have
filed separate briefs.

SUMMARY
OF THE ISSUES

Frank Cass raises
six points of error:  (1) there was
insufficient evidence that he was personally liable for breach of contract,
fraud, and conversion; (2) the evidence was insufficient to allow Stephens to
recover outside the limitations period under the JOAs or, alternatively, the
discovery and fraudulent concealment rules should not apply to toll the running
of the appropriate limitation periods under each cause of action; (3) there is
insufficient evidence to support the jury=s
award of exemplary damages; (4) there is insufficient evidence to support the
award of compensatory damages; (5) there is insufficient evidence to support
the jury=s award
of attorney=s fees;
and (6) the trial court erred in determining that sanctions should be imposed.

Michael Cass
raises five points of error:  (1) the
failure to properly account for property moved between wells cannot as a matter
of law constitute conversion; (2) there is insufficient evidence that he
personally converted jointly-owned property; (3) there is insufficient evidence
of the amount of damages resulting from his alleged conversion; (4) the
discovery rule is inapplicable as a matter of law; and (5) the exemplary
damages are unfounded and unjust.  

EXPERT
TESTIMONY








We first address
Eldridge=s
qualifications as an expert witness. 
This is a threshold issue because Eldridge=s
testimony provides crucial evidence to support many of the jury=s findings.  Although Frank and Michael have not attacked
Eldridge=s
qualifications by separate point of error, they have included attacks on his
qualifications as component parts of their challenges to the jury=s findings of liability and its award
of actual and exemplary damages.  We will
therefore resolve the issue of Eldridge=s
competence, first, and address the more specific challenges to his testimony
where appropriate.

The admissibility
of expert testimony is governed by Rule 702 of the Texas Rules of
Evidence.  See Tex.R.Evid. 702.  The qualification of a witness as an expert
is within the trial court=s
discretion.  Broders v. Heise, 924
S.W.2d 148, 151 (Tex. 1996).  Rule 702
contains three requirements for the admission of expert testimony:  the witness must be qualified; the proposed
testimony must be scientific, technical, or other specialized knowledge; and
the testimony must assist the trier of fact to understand the evidence or to
determine a fact issue.  See Tex.R.Evid. 702; E.I. du Pont de
Nemours & Co. v. Robinson, Inc., 923 S.W.2d 549, 556 (Tex. 1995).  The party offering the expert=s testimony bears the burden to prove
that the witness is qualified under Rule 702. 
See Gammil v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 718
(Tex. 1998).  The offering party must
demonstrate that the witness possesses special knowledge as to the very matter
on which he proposes to give an opinion. 
Id.  The test for abuse of
discretion is whether the trial court acted without reference to any guiding
rules or principles.  Robinson,
923 S.W.2d at 558; In re M.D.S., 1 S.W.3d 190, 203 (Tex.App.--Amarillo
1999, no pet.).








Eldridge testified
that he grew up around the oil and gas business, assisting his father in his
used oil field equipment business through high school and college.  In 1966, he graduated from McMurray College
with a B.B.A. with emphasis in accounting. 
He became a certified public accountant (ACPA@) in March of 1968.  After college, he worked for Arthur Anderson
& Company in Dallas, Texas, with clients engaged in the oil and gas, cement,
manufacturing, and processing industries. 
He then became Vice President of Finance and Controller of Harding
Brothers Oil Company, a company engaged in drilling, completing, and operating
oil and gas wells.  Eldridge related that
he was responsible for all accounting functions, including billing on joint
interest accounts.  He was also
responsible for accounting for new and used equipment of a Harding affiliate
company called Pipe & Supply, Inc. 
After Harding, Eldridge worked for at least five other oil and gas
companies.  His duties routinely required
him to handle accounting functions, joint interest billings, and tax
matters.  Next, Eldridge became managing
partner and tax partner in charge of Coopers & Lybrand, Midland,
Texas.  There, he was responsible for the
firm=s due
diligence activities.  Since 1991, Mr.
Eldridge has been a solo practitioner and consultant.  In 1992, he also served as Bankruptcy Trustee
for an oil and gas company that operated about 550 oil and gas wells.

Eldridge explained
that he has performed joint interest audits of oil and gas operators for over
twenty years.  He spent approximately ten
years with companies that operated hundreds of oil and gas wells.  He related that he has extensive knowledge
regarding operating agreements, title opinions, division of interest, joint
interest billings, revenue distribution, accounting, billing, and
collection.  He is a member of the
Council of Petroleum Accountants Society (ACOPAS@) and has served on the tax committee
and the audit committee for the Permian Basin chapter.  COPAS is the recognized authority for the
petroleum accounting industry and is responsible for promulgating accounting
procedures which are attached to virtually every operating agreement.  Eldridge is also a member of The American
Institute of Certified Public Accountants (AAICPA@), and the Texas Society of Certified
Public Accountants.








Eldridge was
offered as an expert in petroleum accounting. 
Clearly, he possessed the requisite knowledge, skill, experience,
training, and education regarding that specific issue.  He was therefore qualified to give an expert
opinion as to whether the Cass Defendants complied with the proper accounting
procedures under the operating agreements. 
The proposed testimony was scientific, technical, and specialized.  The testimony of a petroleum accountant would
have clearly assisted the trier of fact to understand the evidence presented in
this case, and would have helped the jury to determine the fact issues posed by
the parties.  We therefore conclude that
the trial court did not abuse its discretion by admitting the testimony.

The Casses
complain, however, that AEldridge
employed his own, self-invented, untested, and non-industry approved accounting
method rather than the widely used and industry approved COPAS accounting
procedure . . . .@  Specifically, the Casses refer to Eldridge=s use of a AContract
Compliance Verification Procedures.@  The Casses assert that this method of
accounting is not recognized by any authority, is undefined, untested, and
incapable of peer review because only Eldridge knows what the procedures
entail.  Their claim is founded on
Eldridge=s report
wherein he stated that he called his auditing procedures AContract Compliance Verfication
Procedures.@








This complaint is
not new, the Casses presented this claim to the trial court in their motion to
disqualify Eldridge.  The trial court
held a two day hearing on the matter and overruled the Casses= motion.  The Casses reasserted their motion before
Eldridge began testifying.  The trial
court overruled their objection.  On
direct examination during trial, Eldridge explained that the term AContract Compliance Verification
Procedures@ was
taken from COPAS Bulletin Number 3, Paragraph B which states that an
expenditure audit of a joint account serves two main purposes:  verifying and authenticating account
charges and assuring compliance with the operating agreements.  Throughout the litigation of this case,
whether it was during his deposition, the hearing on the motion to disqualify,
or during the trial, Eldridge did not waiver in his testimony that he followed
accepted accounting methods and standards. 
Specifically, he relied on COPAS Bulletin Numbers 3, 5, 8, 16, 23, and
26, various pronouncements of AICPA, and the Rules of the Texas State Board of
Public Accounting.  These bulletins and
pronouncements are all recognized as authoritative and controlling in auditing
joint interest accounts.  We conclude
that the trial court did not err by admitting Eldridge=s
testimony.  Accordingly, we overrule
Frank and Michael=s general
complaints that the trial court abused its discretion by admitting Eldridge=s testimony under Rule 702.[1]

STANDARDS
OF REVIEW

Because we will
address numerous challenges to the sufficiency of the evidence, we first
summarize the applicable standards of review.

Legal
Sufficiency








ALegal sufficiency points of error
assert a complete lack of evidence on an issue, and are designated as >no evidence=
points or >matter
of law= points,
depending upon whether the complaining party had the burden of proof.@ 
W. Wendell Hall, Standards of Review in Texas, 29 St. Mary=s L.J. 476-77 (1998).  When an appellant attacks the legal
sufficiency of an adverse finding on an issue on which he did not have the
burden of proof at trial, the appellant must demonstrate on appeal that there
is Ano evidence@
to support the adverse finding.  Robert
W. Calvert, ANo
Evidence@ and AInsufficient Evidence@ Points of Error, 38 Tex.L.Rev. 361, 364‑68
(1960).  The traditional statement of the
Ano evidence@
standard of review is that the reviewing court considers only the evidence and
inferences that tend to support the findings and disregards all evidence and
inferences to the contrary.  See Garza
v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965); Merrell Dow Pharmaceuticals,
Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997).  A no evidence point will be sustained only
when the record discloses:  (1) there is
a complete absence of evidence of a vital fact; (2) the court is barred by
rules of law or of evidence from giving weight to the only evidence offered to
prove a vital fact; (3) the evidence offered to prove a vital fact is no more
than a mere scintilla; or (4) the evidence conclusively establishes the
opposite of the vital fact.  38 Tex.L.Rev. at 362‑63.  More than a scintilla of evidence exists when
the evidence supporting the finding, as a whole, A>rises to a level that would enable
reasonable and fair‑minded people to differ in their conclusions.=@  Havner, 953 S.W.2d at 711. 

When an appellant
attacks the legal sufficiency of an adverse finding on an issue on which he had
the burden of proof at trial, he must demonstrate on appeal that all vital
facts in support of the issue were conclusively established by the evidence, or
as a Amatter of
law.@  Sterner v. Marathon Oil Co., 767
S.W.2d 686, 690 (Tex. 1989); Kratz v. Exxon Corp., 890 S.W.2d 899, 902
(Tex.App.--El Paso 1994, no writ).  In
reviewing a Amatter of
law@ challenge, the reviewing court engages
in a two-step analysis.  First, the
record must be examined for evidence that supports the jury=s finding, while ignoring all evidence
to the contrary.  Second, if there is no
evidence to support the fact finder=s
answer, then, the entire record must be examined to see if the contrary
proposition is established as a matter of law. 
See Victoria Bank & Trust Co. v. Brady, 811 S.W.2d 931, 940
(Tex. 1991).

 








Factual
Sufficiency

AInsufficient evidence@ or factual insufficiency involves a
finding that is so against the great weight and preponderance of the evidence
as to be manifestly wrong.  When the
party having the burden of proof complains of an unfavorable finding, the point
of error should allege that the findings Aare
against the great weight and preponderance of the evidence.@ 
The Ainsufficient
evidence@ point of
error is appropriate only when the party without the burden of proof on an
issue complains of the court=s
findings.  See Kimsey v. Kimsey,
965 S.W.2d 690, 700 (Tex.App.--El Paso 1998, pet. denied). 

The test for
factual insufficiency points is set forth in In re King=s Estate, 150 Tex. 662, 244 S.W.2d
660 (1951).  In reviewing an
insufficiency of the evidence challenge, we must consider all of the evidence,
both the evidence which tends to prove the existence of a vital fact as well as
evidence which tends to disprove its existence. 
Id.  After having done so,
we will only set aside the finding if the evidence which supports the jury
finding is so weak as to be clearly wrong and manifestly unjust.  See 29 St. Mary=s L.J. at 483-86.  In reviewing a challenge that the jury
finding is against the great weight and preponderance of the evidence, we must
first examine the record to determine if there is some evidence to support the
finding.  If such is the case, then we
must determine, in light of the entire record, whether the finding is so
contrary to the overwhelming weight and preponderance of the evidence as to be
clearly wrong or manifestly unjust, or whether the great weight and
preponderance supports its nonexistence. 
See 29 St. Mary=s L.J. at 483-86.








In assessing a
factual insufficiency point of error, we are guided by the rule that the
reviewing court cannot substitute its conclusions for those of the fact
finder.  In re B.R., 950 S.W.2d
113, 121 (Tex.App.--El Paso 1997, no pet.). 
If sufficient competent evidence of probative force exists to support
the finding, it must be sustained.  Id.  We may not interfere with the fact finder=s resolution of conflicts in the
evidence or pass on the weight or credibility of the witnesses= testimony.  Benoit v. Wilson, 150 Tex. 273, 239
S.W.2d 792, 796 (1951);  Transportation Ins. Co. v. Moriel, 879
S.W.2d 10, 30 (Tex. 1994).  Where
conflicting evidence is present, the fact finder=s
determination on such matters is generally regarded as conclusive.  Kimsey, 965 S.W.2d at 700; In re
B.R., 950 S.W.2d at 121.

We note that the
record is incomplete.  The reporter=s record shows that numerous exhibits
were admitted into evidence.  Only a
portion of those exhibits are in the record here.  It is observed that the Appellants have not
properly designated a partial reporter=s
record pursuant to Tex.R.App.P.
34.6(c).  At oral argument, we requested
that the parties supplement the record with the exhibits they thought were
necessary for our review.  We have not
received any supplementary exhibits.  In
order to obtain a reversal, the appellant has the burden to come forward with a
record showing error which warrants reversal. 
See Murray v. Devco, Ltd., 731 S.W.2d 555, 557 (Tex. 1987).  Because we have been asked to review a number
of sufficiency challenges, the fact that we do not have a full record will
impact our analysis of some issues. 
Under a legal sufficiency standard, we must be able to ascertain all of
the evidence which supports the judgment in order to determine whether there is
more than a scintilla of evidence to support the jury=s
verdict.  Under a factual sufficiency
standard, we must have all of the evidence in order to weigh the competing
groups and determine whether the jury=s
verdict is clearly wrong or manifestly unjust. 
Generally, we presume that omitted evidence supports the findings of the
jury and the judgment of the trial court. 
Murray, 731 S.W.2d at 557. 








PERSONAL
LIABILITY

In his first point
of error, Frank Cass asserts that the evidence is legally and factually
insufficient to support the jury=s
findings that he was personally liable for the actions of Cass Oil Company,
Inc.  We focus on two findings by the
jury:  (1) that Frank Cass remained
operator under JOAs; and (2) that Cass Oil Company, Inc. is the alter ego of
Frank Cass.

Operator
Finding

In question number
one, the jury was instructed that Frank Cass became operator of the properties
on January 1, 1978, by a majority-in-interest vote.  The jury was then instructed that an operator
may resign from his duties at any time upon written notice, and that all
parties to the agreement shall then select a new operator by majority-in-interest
vote.  The jury was further instructed
that Frank did not remain operator if a majority-in-interest waived the
requirement for an affirmative vote by consenting to the substitution of Cass
Oil Company, Inc. as operator.  Waiver
was defined as an intentional surrender of a known right or intentional conduct
inconsistent with claiming the right.

On appeal, Frank
argues that there is Ano
evidence@ or Ainsufficient evidence@ to support the jury=s finding that he remained
operator.  He asserts that Stephens had
notice of the change in operators and did not object.  He relies on his own testimony that General
Stephens consented to the change in operators. 
He also relies on evidence showing that Stephens made payments to Cass Oil
Company, Inc., and that the Railroad Commission recognized Cass Oil Company,
Inc., as the operator of the wells.








Considering his
legal sufficiency challenge, first, we observe that Frank essentially argues
that he established waiver as a matter of law. 
Waiver is an affirmative defense; Frank bore the burden for establishing
this defense.  See Tex.R.Civ.P. 94.  To succeed on appeal, he must demonstrate
that all vital facts in support of the issue were conclusively established by
the evidence.  See Sterner, 767
S.W.2d at 690; Kratz, 890 S.W.2d at 902. 
In applying the first step of our two-step analysis, we first consider
whether there is any probative evidence to support the jury=s finding.  Kratz, 890 S.W.2d at 902.

Here, Frank
admitted that he did not follow through with his 1979 resignation letter, and
remained operator for the next three years. 
The parties stipulated that none of the JOAs identified Cass Oil
Company, Inc., as operator.  The only document
which purports to change the operator name is the 1982 letter on Cass Oil
Company, Inc. letterhead which notified the joint interest owners that the
operator, Frank Cass, was changing his name to Cass Oil Company, Inc.  Mr. Eldridge testified that operators often
change their names without changing the entity itself.  Mrs. Stephens said that Frank did not need
her permission to change his name.  Mrs.
Stephens and another interest owner, Bert Nelson, testified that they always
looked to Frank as the operator of the wells. 
It is undisputed that Cass Oil Company, Inc. was never elected operator,
did not solicit any votes to become operator, and that Mr. Cass knew and
understood the procedure for changing operators.








We conclude that
there is legally sufficient evidence to support the jury=s
finding that Frank remained operator. 
There clearly was a conflict in the evidence about which reasonable
minds could disagree.  The jury was
instructed on waiver, heard Mr. Cass=s
theory of the evidence, and impliedly rejected his argument.  Waiver is inherently a jury question.  See Huffington v. Upchurch, 532 S.W.2d
576, 580 (Tex. 1976).  Finding evidence
to support the finding, we dispense with the second step of our two-part
analysis.  Frank=s
legal sufficiency challenge is overruled.

We next consider
whether the evidence is factually sufficient to support the jury=s finding.  Because Frank had the burden of proof to
establish his waiver defense, we consider whether the jury=s findings are so contrary to the
overwhelming weight and preponderance of the evidence as to be clearly wrong or
manifestly unjust.  As stated above,
there was some evidence which supports the jury=s
finding, thus, we concentrate on the evidence which conflicts with the jury=s finding.  Frank relies primarily upon the 1979
resignation letter, the 1982 change-of-name letter, the fact that no one
objected to the change in name of the operator, the fact that all of the joint
interest owners made payment to Cass Oil Company, Inc., and the fact that the
Texas Railroad Commission recognized Cass Oil Company, Inc. as the operator of
the wells.  This evidence is significant,
however, it is not conclusive on the issue of waiver.  Frank=s
purported resignation is controverted by the fact that he remained the operator
for three years after his alleged resignation. 
The operating agreements were never amended to show the election of a
new operator.  The JOAs are the basis for
the parties legal rights, duties, and liabilities.  The fact that no one objected to the change
in the operator=s name
does not prove that the operator in fact changed from Frank Cass to Cass Oil
Company, Inc.  In addition, the fact that
the Railroad Commission recognized Cass Oil Company, Inc. as the operator does not
conclusively establish the matter as between the parties to the JOAs.








Here, the question
of waiver centers on the intent and actions of the parties.  The parties made a contract and provided that
there was a specific and technical way to elect a new operator.  Frank=s
evidence permits an inference that Stephens and the other joint interest owners
may have waived their objections to the substitution of Cass Oil Company, Inc.,
as the operator, but it is not the only reasonable inference to be drawn from
the evidence.  The issue of waiver
required the jury to weigh the testimony of Frank Cass against that of Mrs.
Stephens, Bert Nelson, and Mr. Eldridge. 
It required that the jury resolve a clear conflict in the evidence.  We conclude the jury=s
finding that Frank Cass remained operator, and its implied finding that Cass
Oil Company, Inc., failed to become operator by waiver is not so contrary to
the overwhelming weight and preponderance of the evidence as to be clearly
wrong or manifestly unjust.  Accordingly,
Frank Cass=s factual
sufficiency challenge is overruled.

Alter
Ego Finding

Here, Frank
contends that there is no evidence or insufficient evidence to support the
finding.  Specifically, he argues that
there is no evidence or insufficient evidence that he used Cass Oil Company,
Inc., to commit an actual fraud for his own direct personal benefit. 








Under the alter
ego theory, courts disregard the corporate entity when there exists such unity
between corporation and individual that the corporation ceases to be separate
and when holding only the corporation liable would promote injustice.  Mancorp, Inc. v. Culpepper, 802 S.W.2d
226, 228 (Tex. 1990), citing Castleberry v. Branscum, 721 S.W.2d 270,
272 (Tex. 1986).  An alter ego
relationship may be shown from the total dealings of the corporation and the
individual.  Id. at 272.  This showing may include evidence of Athe degree to which corporate
formalities have been followed and corporate and individual property have been
kept separately, the amount of financial interest, ownership and control the
individual maintains over the corporation, and whether the corporation has been
used for personal purposes.@  Id. 
In order to hold a shareholder liable for a corporation=s actions, Article 2.21 of the Texas
Business Corporations Act requires a plaintiff to prove that the shareholder
caused the corporation to be used for the purpose of perpetrating and did
perpetrate an actual fraud on the plaintiff primarily for the direct benefit of
the shareholder.  See Tex.Rev.Civ.Stat.Ann. art.
2.21(A)(2)(Vernon Supp. 2001); see also, Menetti v. Chavers, 974 S.W.2d
168, 173-75 (Tex.App.--San Antonio 1998, no pet.).  

Frank first
complains that there is no finding that he used Cass Oil Company, Inc., to
commit an actual fraud on Stephens.  He
asserts that the jury=s
finding must be overturned because Article 2.21 requires a specific finding of
actual fraud in connection with an alter ego finding.  We agree that Article 2.21 requires a finding
of actual fraud, but we disagree with his contention that there is no such
finding in this case.  The jury was
instructed that it could not find Cass Oil Company, Inc. was the alter ego of
Frank unless it also found that Frank caused Cass Oil Company, Inc. to be used
to perpetuate an actual fraud on Stephens. 
Thus, the jury impliedly found that Frank used the corporation to commit
an actual fraud on Stephens when it found that the corporation was his alter
ego.  Frank made no objection to
submitting the charge in this form and has not asserted on appeal that there is
any error in the trial court=s
charge to the jury.  Instead, he has
chosen to attack the sufficiency of the evidence to support the alter ego
finding.  Additionally, we note that the
jury specifically found that he committed common-law fraud by misrepresentation
in question number thirteen of the jury charge. 
As a consequence, his complaint that there is no finding of actual fraud
is overruled.








We now turn to
Frank=s legal
sufficiency challenge to the implied finding of actual fraud.  Stephens had the burden of proving that Frank
caused Cass Oil Company, Inc. to perpetrate an actual fraud on her for his own
direct benefit.  Actual fraud by
misrepresentation consists of a representation that is:  (1) material; (2) false; (3) knowingly false
or made with reckless disregard for its truth or falsity; (4) made with the
intention that it be acted upon by the other party; (5) relied upon by the
other party; and (6) damaging to the other party.  Menetti, 974 S.W.2d at 175.

Stephens put on
evidence showing that the Stephens=
wells were billed for numerous goods and services provided solely to the Cass
companion wells.  Mr. Eldridge testified
that Cass Oil Company billed the Stephens=
wells for ad valorem tax services, salt water hauling services, electricity,
and road work, which were incurred by Cass companion wells.  Moreover, Eldridge explained that numerous
delivery tickets and vendor=s
invoices were modified by Frank in order to divert expenses from the Cass companion
wells to the Stephens=
wells.  The jury was shown exhibits which
apparently showed that Frank modified the tickets and invoices, and approved
the charges, often with his own handwriting. 
Those documents, Plaintiff=s
Exhibits 1202 A through 1202 TTT, are not a part of the record on appeal, but
were admitted into evidence.[2]  Mr. Eldridge=s
report also contains evidence that Stephens was charged operating expenses for
wells that were inactive. 








From this
evidence, a jury could rationally find that Frank used Cass Oil Company, Inc.
to perpetuate a fraud on Stephens.  The
evidence shows that he charged expenses incurred on the Cass companion wells to
the Stephens=
wells.  These charges showed up on the
joint interest bills as apparently legitimate charges for operating
expenses.  The charges were material
representations that Stephens owed money for expenses which she in fact had not
incurred.  A rational jury could have
found that Frank knowingly submitted the false bills from the fact that he
personally altered and signed many of the tickets and invoices which
misallocated the operating expenses.  It
is also reasonable to infer that the bills were made with the intent that
Stephens rely upon them.  There is
evidence that she in fact paid the bills to her detriment.  Viewed in the light most favorable, we
conclude that there is legally sufficient evidence to support the jury=s implied finding.  Accordingly, we overrule Frank=s legal sufficiency challenge.

We now consider
whether the evidence is factually sufficient to support the jury=s implied finding, and turn to the
evidence which conflicts with the jury=s
determination.  Frank urges that we
consider the fact that he owned an equal if not greater interest in the
Stephens= wells
than Appellees.  He points out that if
the Stephens= wells
were improperly charged, then he was improperly charged as well.  He also relies on Eldridge=s statement that he could not find any
evidence that Frank personally received any money from the affiliate companies
that overcharged the Stephens=
wells for goods and services.  Frank
argues that there is no proof that any of the overcharges benefitted him
personally.








We are unpersuaded
by this argument.  Assuming he paid the
charges, he is no doubt correct in asserting that he still had to pay a
proportional share of the misapplied charges. 
But that does not end our analysis. 
The evidence clearly shows that Frank generally owned an interest of
43.7 percent to 50 percent in the Cass companion wells, with his own family
members owning the rest.  By contrast,
Frank Cass generally owned smaller interests in the Stephens= wells--anywhere from a low of 12
percent to a high of 50 percent--with the remaining interest owned by Stephens
and various other persons.  Allocating
charges to an account in which an individual owns a smaller interest benefits
him economically.  If he bills $100 to an
account that he owns a 100 percent share in, he pays $100.  If he bills $100 to an account that he owns a
50 percent share in, he pays $50.  If he
misallocates a bill of $100 to an account that he owns a 20 percent share in,
rather than an account that he owns a 50 percent interest in, then he pays $20
rather than $50.  The jury could properly
infer that Frank personally benefitted from the misallocation of expenses to
the Stephens=
wells.  The jury was also at liberty to
consider the benefit which inured to Frank when his family received free goods
and services at the expense of others. 
Having assayed all the evidence, we conclude that the evidence that
supports the jury=s verdict
is not so weak as to be clearly wrong and manifestly unjust.  Frank=s
factual sufficiency complaint is overruled.

In summary, we
conclude that there is both legally and factually sufficient evidence to
support the jury=s
findings that Frank remained the operator under the JOAs, and that Cass Oil
Company, Inc. was his alter ego.  Frank=s first point of error is overruled.

FRAUD

In his fourth
point of error, Frank complains that there is legally and factually
insufficient evidence to support the jury=s
findings that he committed fraud and conversion.  As noted, the jury found that Frank Cass had
committed common-law fraud by misrepresentation in question number thirteen of
the jury charge.  In light of our
analysis above, we overrule Frank=s
sufficiency challenge to the fraud finding.

CONVERSION








We now consider
Frank and Michael=s attack
on the jury=s
conversion findings.[3]  Conversion is the unauthorized and unlawful
assumption and exercise of dominion and control over the personal property of
another which is to the exclusion of, or inconsistent with, the owner=s rights.  Waisath v. Lack=s
Stores, Inc., 474 S.W.2d 444, 446 (Tex. 1971); Whitaker v. Bank of El
Paso, 850 S.W.2d 757, 760 (Tex.App.--El Paso 1993, no writ).  Plaintiff must prove that at the time of the
conversion, he was the owner of the property, had legal possession of it, or
was entitled to possession.  Whitaker,
859 S.W.2d at 760. 

Here, the JOAs
created a cotenancy relationship. 
Rankin v. Naftalis, 557 S.W.2d 940, 946 (Tex. 1977); Hamilton v.
Texas Oil & Gas Corp. 648 S.W.2d 316, 321 (Tex.App.--El Paso 1982, writ
ref=d n.r.e.); Donnan v. Atlantic
Richfield, 732 S.W.2d 715, 717 (Tex.App.--Corpus Christi 1987, writ
denied).  Each working interest owner
held an undivided interest in the property. 
A cotenant has the right to be in possession of the property in which he
owns an interest.  Todd v. Bruner,
365 S.W.2d 155, 160 (Tex. 1963); Tynes v. Mauro, 860 S.W.2d 168, 176
(Tex.App.--El Paso 1993, writ denied). 
The operator was given full control of all operations, but each working
interest owner had the right to enter the common estate. 

A cotenant may
maintain a conversion suit against another cotenant who has appropriated the
entire commonly owned property for his own use and benefit.  Grabes v. Fawcett, 307 S.W.2d 311, 315
(Tex.Civ.App.--Texarkana 1957, no writ). 
If possession is initially lawful, demand and refusal to return the
property may be required for the cause of action to accrue.  See Hofland v. Elgin-Butler Brick Co.,
834 S.W.2d 409, 413 (Tex.App.--Corpus Christi 1992, no writ); Young v. J
& J Bail Bonds Co., 792 S.W.2d 484, 485 (Tex.App.‑‑El Paso
1990, no writ).  Demand and refusal are
not necessary, however, when the possessor=s
acts manifest a clear repudiation of the plaintiff=s
rights.  Whitaker, 850 S.W.2d at
760; Hofland, 834 S.W.2d at 414.








The record
contains evidence that jointly-owned equipment was transferred from Stephens= wells to Cass companion wells.  Eldridge=s
report contains a section related to material transfers.  His five volume report goes into detail on a
well-by-well basis and summarizes the transfers of jointly-owned equipment to
the Cass companion wells.  Eldridge
testified that he was able to reconstruct the movement of the jointly-owned
equipment by using the trash documents. 
Exhibits 704, 704A, 706, and 708 are handwritten notes by Cass employees
concerning the material transfers. 
Exhibits 707, 707A, and 707B, are Frank=s
own handwritten notes concerning the material transfers.  Using these handwritten notes, and various
developments files thrown away by Frank, Eldridge discovered that the Casses
transferred jointly-owned equipment to the companion wells without giving
credit to the Stephens=
wells.  The Casses later sold their
interests in the companion wells to a third party for $12 million.

One of the
examples given to the jury was the equipment transfers regarding the Ganze

 7-1 well. 
Exhibit 708 shows that a pump jack was moved to the Ganze 7-1, a
Stephens= well, in
November 1975, and the joint account was billed $14,850.  In February 1980, the pump jack was moved to
the Driver 34-2, another Stephens=
well.  The joint account was again billed
another $14,850 for the pump plus $1,200 for a concrete base, and no credit was
issued to the Ganze well.  Later, the
pump jack was moved to the Smith 1, a Cass companion well, and no credit was
issued to the Driver.  The net effect of
these transfers is that Stephens paid twice for a pump jack, that was then
moved to a Cass companion well, and was later sold to a third party, without
any credit being issued for the transfers. 








First, Frank and
Michael both assert that there is legally and factually insufficient evidence
to support a conversion finding because there is no proof that their exercise
of dominion and control over the property was unauthorized or unlawful.  Specifically, they argue that the COPAS
accounting procedures attached to the JOAs authorized the operator to move
jointly-owned equipment between the wells, and also authorized the operator to
purchase or take equipment in kind.  They
contend that their failure to properly account for the movement of equipment
was a breach of contract, not conversion. 
We disagree.

We find compelling
evidence which supports the jury=s
findings.  The evidence shows that Frank
and Michael moved jointly-owned equipment to their solely owned wells without
giving credit to the joint accounts.  The
evidence also shows a pattern of abuses by the Casses: making the joint
interest owners pay multiple times for the same property; discontinuing their
procedures for documenting material transfers thereby making it harder to trace
the property movements transfers; the destruction of documents which show the
equipment transfers; failing to give the Gruy auditors the documents necessary
for tracing the equipment transfers; and finally the sale of the jointly-owned
property to a third party.  From this
evidence, the jury reasonably could infer that the accounting errors were not
just fortuitous or by accident, but were intentionally done so that the Casses
would benefit at the expense of others. 
The evidence clearly supports the findings that Frank and Michael
unlawfully appropriated the jointly-owned equipment for their own use and
benefit.








While accounting
procedures authorize the operator to purchase jointly-owned equipment, the
context here is that the Casses removed large amounts of jointly-owned
equipment to their solely owned wells without paying for the equipment.  The facts also show a pattern of deception
concerning the movements of the equipment and an attempt to hide the
transfers.  These facts may prove a
breach of the operating agreements, but they also support a claim for
conversion.  Considering the evidence,
the jury was free to infer that the prolonged retention of the equipment without
payment was an act of conversion and not merely a breach of contract.  We conclude that there is legally and
factually sufficient evidence to support the jury=s
findings.

Second, Michael
Cass claims that there is insufficient evidence that he personally converted
any equipment.  He asserts that the
evidence does not support a finding that he used the property for his own
personal benefit.  Essentially, he claims
ignorance of the accounting errors made by his father.  He argues that he should not be responsible
for his father=s
wrongful acts.

A corporate
officer or agent is always primarily liable for his own torts, even though the
principal is also vicariously liable.  Permian
Petroleum Co. v. Barrow, 484 S.W.2d 631, 634 (Tex.Civ.App.--El Paso 1972,
no writ); Portlock v. Perry, 852 S.W.2d 578, 582 (Tex.App.--Dallas 1993,
writ denied).  An employee may be held
individually liable for an employer=s
tortious acts if he knowingly participates in the conduct or has knowledge of
the tortious conduct, either actual or constructive.  Portlock, 852 S.W.2d at 582.  Instigating, aiding, or abetting the
wrongdoing constitutes participation.  Permian
Petroleum Co., 484 S.W.2d at 634. 
The employee or agent may be held liable regardless of whether he
receives any personal benefit from the tortious act.  Gardner Machinery Corp. v. U.C. Leasing,
Inc., 561 S.W.2d 897, 899 (Tex.Civ.App.--Beaumont 1978, writ dism=d).








The evidence shows
that during the period from 1977 to 1978, Michael Cass had responsibility for
most aspects of drilling and field operations. 
He then moved back to Dallas and helped his father run the
business.  The record contains material
transfer orders with Michael Cass=s
initials approving equipment transfers. 
Eldridge testified that Michael Cass=s
initialed and approved many of the transfers of equipment from the Stephens= wells to the Cass companion
wells.  From this evidence, the jury
reasonably could infer that Michael Cass had knowledge of the transfers, that
he participated in the conversions, and that he personally benefitted from the
transfers.  We conclude that there is
both legally and factually sufficient evidence to support the findings of
liability against Michael.

Third, Frank and
Michael complain that the evidence is insufficient to support the jury=s award of damages.  The measure of damages for conversion is the
value of the property at the time and place of the conversion.  Prewitt v. Branham, 643 S.W.2d 122,
123 (Tex. 1982)(per curiam); Edlund v. Bounds, 842 S.W.2d 719, 727
(Tex.App.--Dallas 1992, writ denied). 
The Casses argue that there is no competent evidence proving the market
value of the converted property. 
Specifically, they contend:  that
Eldridge was not qualified to state an opinion as to the market value of the
equipment; that he did not supply any information concerning the market value
of the equipment; and that his damage calculations were based on erroneous
facts.








The record
reflects that the Casses have not preserved their complaints for our
review.  Although Michael and his father
filed a motion to exclude Eldridge=s
testimony, the motion did not raise the three issues now asserted.  To preserve a complaint that scientific
evidence is unreliable and thus, no evidence, a party must object to the
evidence before trial or when the evidence is offered.  Maritime Overseas Corp. v. Ellis, 971
S.W.2d 402, 409 (Tex. 1998).  Without
requiring a timely objection to the reliability of the scientific evidence, the
offering party is not given an opportunity to cure any defect that may exist,
and will be subject to trial and appeal by ambush.  Id. 
During the second day of trial, the trial court warned the Cass
Defendants that he could not rule on general complaints lodged against Eldridge=s testimony.  The trial court told them to object to the
specific testimony they believed was unreliable.  We also observe that the evidence concerning
the market value of the equipment was presented over a number of days and
Eldridge=s entire
report was admitted into evidence.  If in
fact there was an objection remotely close to the contentions raised here, it
no doubt has been waived because the same evidence was presented elsewhere in
the record without objection.  Richardson
v. Green, 677 S.W.2d 497, 501 (Tex. 1984).

Assuming,
arguendo, that the complaints had been preserved, the record contains evidence
showing that Eldridge was qualified to give an opinion as to the market value
of the equipment.  For over twenty years,
Eldridge has been closely associated with the financial operations of numerous
oil and gas businesses.  He has handled
tax matters, accounting matters, and matters related to the drilling,
completion, and operation of oil and gas wells. 
Specifically, he has accounted for both new and used equipment during
his extensive career.  Eldridge stated
that he relied on the COPAS bulletins, the recognized authorities for oil and
gas accounting, in determining the equipment values.  Clearly, Eldridge was qualified to state an
opinion regarding the market value of the converted equipment.

In summary, we
conclude there is both legally and factually sufficient evidence to support the
jury=s
findings of conversion against Frank and Michael.  There is also evidence to support the jury=s award of damages.  Accordingly, we overrule those portions of
Frank=s fourth
point of error which challenge the sufficiency of the evidence to support the
conversion finding and the award of damages; we also overrule Michael=s first, second, and third points of
error. 

LIMITATIONS








The next issue for
consideration regards the jury=s
fraudulent concealment and discovery rule findings.  Fraudulent concealment is an affirmative
defense to the statute of limitations.  Weaver
v. Witt, 561 S.W.2d 792, 793 (Tex. 1977). 
It is based upon the doctrine of equitable estoppel.  In the proper case, invocation of fraudulent
concealment estops a defendant from relying on the statute of limitations as an
affirmative defense to plaintiff=s
claim.  Where a defendant is under a duty
to make disclosure but fraudulently conceals the existence of a cause of action
from the party to whom it belongs, the defendant is estopped from relying on
the defense of limitations until the party learns of the right of action or
should have learned thereof through the exercise of reasonable diligence.  See Borderlon v. Peck, 661 S.W.2d 907,
909 (Tex. 1983); see also, Computer Associates International Inc. v. Altai,
Inc., 918 S.W.2d 453, 455-56 (Tex. 1994). 
The plaintiff has the burden of coming forward with proof to support the
allegation.  Weaver, 561 S.W.2d at
793.  In summary, the plaintiff must
show:  (1) existence of the underlying
tort; (2) the defendant=s
knowledge of the tort; (3) the defendant=s
use of deception to conceal the tort; and (4) the plaintiff=s reasonable reliance on the
deception.  Arabian Shield Development
Co. v. Hunt, 808 S.W.2d 577, 584 (Tex.App.--Dallas 1991, writ denied).  Fraudulent concealment applies to any cause
of action, including breach of contract claims. 
Hurbrough v. Cain, 571 S.W.2d 216, 221 (Tex.Civ.App.--Tyler 1978,
no writ)(Opin. on reh=g);
Shipp v. O=Dowd,
454 S.W.2d 845, 847 (Tex.Civ.App.--Waco 1970, writ ref=d
n.r.e.).








The discovery rule
is not a plea of confession and avoidance, rather, it is a test to be applied
in determining when a plaintiff=s
cause of action accrued.  Weaver,
561 S.W.2d at 794.  The rule applies as
an exception to the statute of limitations when the injury is inherently
undiscoverable and objectively verifiable. 
Computer Associates International, Inc., 918 S.W.2d at 456.  The discovery rule exception defers accrual
of a cause of action until the plaintiff knew or, exercising reasonable
diligence, should have known of the facts giving rise to the cause of
action.  Id. at 455, citing
Trinity River Auth. v. URS Consultants, 889 S.W.2d 259, 262 (Tex. 1994).

Fraudulent
Concealment

Under the
accounting procedures attached to the parties JOAs, Stephens had two years to
bring a claim for a billing adjustment following the expiration of the calendar
year in which the billing was made. 
Pursuant to this limitations period, Stephens first obtained jury
findings that Frank had breached the operating agreements during the period
from January 1, 1984, until the date suit was filed on November 4, 1986.  The jury awarded Stephens $317,905.59 as
damages for these breaches of the operating agreements.  Next, Stephens obtained findings:  that Frank fraudulently concealed the breach
of contract claims; that the earliest date Stephens had knowledge of the
concealment was March 1, 1986; and that the concealed breaches, outside of the
two-year limitations period, were worth $268,256.58 in damages. 

First, Frank
asserts that there is no evidence or insufficient evidence to support the
fraudulent concealment findings.  We
disagree.  Eldridge identified seventeen
categories of breaches of the operating agreements.  These categories include overcharges for
fixed rate overhead, field supervision fees, legal fees, revenue distribution
fees, contract operations, unauthorized expenditures, seven different
overcharges for affiliate services, and other exceptions.  In addition, there were numerous unauthorized
charges for costs related to the Cass companion wells.  Eldridge provided days of testimony
explaining these items in detail, and he was cross-examined for at least six
days of the trial. 








Burt Nelson
related that Frank was meticulous in nature, closely scrutinizing his books and
records.  Gregg Cass testified that his
father reviewed the joint interest billings before they were sent out.  There was evidence that Frank suspended many
of the accounting procedures used by Stephens & Cass to document joint
interest expenses.  Eldridge explained
that Frank kept a very detailed accounting of the expenditures for himself, but
sent out a very condensed and abbreviated accounting to the joint interest
owners.  He stated that Stephens= version contained little information
concerning the details of the expenditures. 
He explained that this procedure was highly unusual and irregular in the
oil and gas business.  Moreover, he
opined that the procedure was implemented to keep Stephens from discovering the
types of costs that were being billed to the joint accounts.  

There was also
evidence that Frank specifically tried to conceal his relationship with
numerous affiliate companies.  Eldridge
recounted that he had seen stock books, stock registers, corporate minutes,
minutes from organizational meetings, copies of checks, and letters, which
supported his conclusion that companies such as General Water Haulers, Major
Pipe, and Apple Cass were affiliates owned and controlled by the Casses.[4]  He noted that the relationships had not been
disclosed to the Gruy auditors. 
Moreover, there is the undisputed evidence that Frank threw away
documents that were not disclosed to Gruy and were relevant to Stephens= discovery requests.








From this
evidence, a rational jury could infer: 
that numerous breach of contract claims existed; that Frank Cass had
knowledge of the claims; that he used deception to conceal the claims; and that
Stephens relied on the deception when she paid her bills.  We conclude that there is legally sufficient
evidence to support the jury=s
fraudulent concealment findings.  See
Arabian Shield Development Co., 808 S.W.2d at 584.

Next, we consider
whether the evidence is factually sufficient. 
Frank claims that Stephens failed to use diligence in detecting her
cause of action.  He claims that there
can be no fraudulent concealment because she was authorized, under the JOAs, to
review the company=s records
anytime she wanted.  He claims that her
failure to do so bars her claims.  To
support his position, Frank relies on his own testimony that General Stephens
regularly discussed the joint interest bills with him and was very
knowledgeable about them.  He points to
the fact that General Stephens made a $225,000 prepayment of expenses in
December of 1983, and argues that it shows the General agreed with his
operating procedures.  Finally, Frank
points to testimony by Mrs. Stephens that he always gave her and the General
every document they ever requested, prior to the commencement of the lawsuit.








We conclude that
the jury=s finding
is not so against the great weight and preponderance of the evidence as to be
clearly wrong or manifestly unjust. 
Here, there is compelling evidence that Frank would not have disclosed
any documents which established his misconduct had Stephens requested to see
the records.  The jury was aware that
Frank had not disclosed all of the records to Gruy, and that he attempted to
destroy evidence of his wrongdoing.  The
jury could rationally have inferred that Frank would not have disclosed any
documents establishing his misconduct had Stephens requested the
documents.  Frank=s
testimony that the General regularly discussed the joint interest bills with
him, and was knowledgeable about them, stands in strong contrast to the
portrait of the General as weak, soporific, and unable to manage his financial
affairs during the later years of his life. 
It was for the jury to resolve the conflicts in the evidence and to
assess Frank=s
credibility.  The fact that the General
prepaid his expenses permits an inference that the General approved and trusted
Frank=s actions
as operator.  It does not, however, prove
that the General was aware of Frank=s
breaches of the operating agreements, that he approved of them, or that he was
in any way aware of Frank=s
misconduct.  On the contrary, Stephens= evidence supports an inference that
she would not have been able to detect many of the breaches of the operating
agreements until after she recovered the trash documents.  Finally, the fact that Frank gave Stephens
all the documents she requested, prior to the lawsuit, does not prove that
Frank did not conceal his breaches of the operating agreements.  A review of the entire record demonstrates
that Frank presented his theory to the jury, and that the jury rejected his
position.  The jury was the sole judge of
the credibility of the witnesses, and it was their duty to resolve the
conflicts in the evidence.  Accordingly,
we overrule Frank=s factual
sufficiency challenge.

Discovery
Rule








Again, as
discussed above, the jury found that Frank Cass committed common-law fraud in
question number thirteen of the jury charge. 
The statute of limitations for fraud claims is four years. 
Tex.Civ.Prac.&Rem.Code Ann. '
16.004 (Vernon Supp. 2001).  In question
number fourteen, Stephens obtained a jury finding awarding her damages of
$68,136.69 for the acts of fraud committed within the four-year limitations
period.  Next, she obtained findings that
she could not have discovered the fraud before September 24, 1986, and that her
damages for the acts of fraud committed outside the limitations period were
$33,164.23.  The findings that Frank and
Michael converted jointly-owned equipment are similar to the fraud
findings.  Stephens first obtained
findings that Frank and Michael converted $14,070.38 of equipment during the
applicable two-year statute of limitations. 
Tex.Civ.Prac.&Rem.Code Ann.
' 16.003.  Next, she obtained findings that the
conversion of equipment could not have been discovered before September 24,
1986, and that her damages for conversion outside the applicable limitations
period was $84,710.44.

First, we address
Frank=s
assertion that the discovery rule does not apply to breach of contract
claims.  The record clearly shows that
the discovery rule findings were returned on the fraud and conversion
claims.  Fraudulent concealment was the
theory used to extend Frank=s
liability beyond the limitations period set out in the JOAs.  We therefore overrule this complaint.  

Second, we address
Frank=s
challenges to the sufficiency of the evidence to support the discovery rule
findings on Stephens=
fraud claims.  Frank once again argues
that Stephens failed to use reasonable diligence in ascertaining her causes of
action against him.  He contends that
Stephens could have requested the records and discovered his fraudulent
behavior.  He asserts that his misconduct
was so obvious that it was inherently discoverable.  

We have already
concluded that there was legally and factually sufficient evidence to support
the fraud findings against Frank.  In
finding fraud, the jury impliedly found that Frank knowingly made material
misrepresentations on the joint interest bills intending that the joint owners rely
on those misrepresentations.  Texas
courts have long adhered to the view that fraud vitiates whatever it touches,
and have consistently held that a party will not be permitted to avail himself
of the protection of a limitations statute when by his own fraud he has
prevented the other party from seeking redress within the period of
limitations.  See Borderlon, 661
S.W.2d at 908-09.  To reward a wrongdoer
for his own fraudulent contrivance would make the statute a means of
encouraging rather than preventing fraud. 
Id.








Whether Stephens
would have received the documents she needed to discover Frank=s acts of fraud is debatable.  Reasonable minds could differ about what the
evidence shows.  Here, the jury was aware
of Frank=s
attempts to avoid detection by failing to disclose information on the joint
interest billings, failing to disclose all documents to Gruy, and by his
destruction of evidence.  The jury was
also offered testimony that the fraud was not readily discoverable from the
joint interest bills.  From this
evidence, the jury rationally could have found that Frank=s acts of fraud were not inherently
discoverable.  We conclude that there is
legally and factually sufficient evidence to support the jury=s findings.

Third, we consider
Frank and Michael=s
assertion that the discovery rule does not apply to conversion claims.  We disagree. 
In Sunwest Bank of El Paso v. Basil Smith Engineering Co., Inc.,
we said that a cause of action for conversion ordinarily accrues on the date of
conversion unless possession was initially lawful.  939 S.W.2d 671, 674 (Tex.App.--El Paso 1996,
writ denied).  When possession is
initially lawful, a cause of action for conversion accrues upon demand and
refusal, or discovery of facts supporting the cause of action, whichever occurs
first.  Hofland, 834 S.W.2d at
414.  Here, the possession was initially
lawful and no demand was made before Stephens discovered her injury.  Consequently, we overrule this complaint.








Fourth, we address
Frank=s
challenge to the sufficiency of the evidence to support the discovery rule
findings on Stephens=
conversion claims.  Frank asserts that
the discovery rule is inapplicable because the facts show that the injury was
inherently discoverable.  Again, he asserts
the fact that Stephens could have requested and audited the company records at
anytime.  In the present case, Frank and
Michael had exclusive possession and control over the jointly-owned equipment.  Stephens had no reason to know that the
Casses had secretly transferred the equipment to the companion wells, or that
they later sold the equipment to a third party. 
Many of the acts of conversion by Frank and Michael were only discovered
after the Gruy audit was complete and the trash documents were recovered.  We conclude that the injuries were not
inherently discoverable, Hofland, 834 S.W.2d at 414, and that there is
legally and factually sufficient evidence to support the jury=s findings.

In summary, we
conclude that the jury=s
fraudulent concealment and discovery rule findings are supported by legally and
factually sufficient evidence.  As a
consequence, Stephens=
claims are not restricted by the ordinary accrual dates under the relevant
statutes of limitation for breach of contract, fraud, and conversion.  Accordingly, we overrule Frank=s second and Michael=s fourth points of error.   

TORT
OR CONTRACT

We now address
Frank and Michael=s
complaint that Stephens is barred as a matter of law from any tort recovery in
this case because her claims only sound in contract.  We have already concluded that there is
sufficient evidence to support the jury=s
findings on Stephens=
fraud and conversion claims.  Now we
address whether her tort claims are sufficiently independent from her breach of
contract claim.  








The law of Acontorts@
is a muddy area, devoid of bright line rules or easy answers as to what conduct
constitutes a tort, and what a breach of contract.  The acts of a party may breach duties in tort
or contract alone, or simultaneously in both. 
The Texas Supreme Court has observed that it is the nature of the injury
which is most helpful in determining which duty or duties are breached.  When the injury is only economic loss to the
subject of a contract itself, the action sounds in contract alone.  Southwestern Bell Telephone Company v.
DeLanney, 809 S.W.2d 493, 495 (Tex. 1991); Jim Walter Homes, Inc. v.
Reed, 711 S.W.2d 617, 618 (Tex. 1986); Airborne Freight Corp., Inc. v.
C.R. Lee Enterprises, Inc., 847 S.W.2d 289, 293 (Tex.App.--El Paso 1992,
writ denied).  Contract obligations arise
from a specific agreement between the parties. 
Tort obligations, in contrast, are those that are imposed by law‑‑apart
from and independent of promises made.  DeLanney,
809 S.W.2d at 494; Airborne Freight Corp., Inc., 847 S.W.2d at 294.

Here, Stephens
carefully delineated between the acts that were alleged to be breaches of
contract, fraud, and conversion.  She
designated the numerous categories of overcharges and the charges for expenses
not authorized by the JOAs as breach of contract injuries.  She designated the charges for expenses related
to the Cass companion wells and the charges for property already owned by the
joint owners as fraud injuries.  She
designated the removal of 

jointly-owned equipment to the Cass
companion wells as conversion injuries.

Fraud

First, we consider
whether Frank=s conduct
breached an obligation at law or in contract. 
In this case, the JOAs authorized Frank to bill the joint interest
owners for certain expenses incurred in operating the jointly held leases.  The agreements did not authorize Frank to
bill the joint accounts for expenses incurred on the Cass companion wells, or
to double-bill for equipment already owned by the joint accounts.  We conclude that Frank breached a duty
imposed by law when he fraudulently induced the joint interest owners to pay
for goods and services they never received. 
Specifically, Frank induced the joint interest owners to pay for the
goods and services by submitting bills that intentionally misrepresented that
they were authorized by the agreements. 
Thus, the agreements created a conduit for committing the torts, but the
duty breached exists independent from the agreements. 








Second, we
consider the nature of the injury.  Here,
the subject matter of the agreements is the operation of the jointly-owned
wells.  To the extent that Stephens was
billed for goods and services that went to the Cass companion wells, her
damages relate to charges that are independent of the JOAs.  In addition, we reject the contention that
Stephens= injury
is contractual because she recovered economic damages.  See Formosa Plastics Corp. U.S.A. v.
Presidio Engineers & Contractors, Inc., 960 S.W.2d 41, 47 (Tex.
1998)(holding that tort damages are not precluded simply because the tort
causes only economic loss).  Frank=s fraud caused the joint interest
owners to pay for good and services they never received.  Logically, their damages are
economic--fraudulently induced payment of money results in money damages.  We conclude that the injury is tortious in
nature.

Conversion

First, we consider
the obligation breached.  Frank and
Michael=s
unlawful appropriation of the jointly-owned equipment, for the use and benefit
of their solely owned wells, breached an obligation that exists independent of
the JOAs.  Just as the unauthorized
removal by a third party constitutes theft, the unauthorized appropriation of
the jointly-owned equipment, here, constitutes conversion.  The conduct breaches an obligation which
exists outside the contract, and had nothing to do with the JOAs.  As a consequence, we conclude that Frank and
Michael breached a duty imposed by law.








Second, we
consider the nature of the injury.  Here,
the injury consists not only of the misappropriation of the equipment, but also
the deception regarding the equipment transfers.  The damages relate to the removal of the equipment
to the Cass companion wells and, therefore, do not concern the subject matter
of the JOAs--the Stephens=
wells.  Stated differently, the injury
breaches Frank and Michael=s
legal duty to avoid converting the jointly-owned equipment, not just their
contractual duty to honestly account for the movement of the equipment.  We conclude that the injury is tortious in
nature.

Having considered
the obligations breached and the nature of the injuries, we conclude that
Stephens= tort
claims are sufficiently independent from her contract claim.  Accordingly, we overrule Frank=s third point of error, and Michael=s complaint contained within his second
point of error.

OFFSET

We now address
Frank=s
complaint that he is entitled to an offset for monies owed by Stephens.  He contends that Stephens did not pay Cass
Oil Company, Inc. for her share of the operating expenses.  The record reflects that Stephens paid her
share of the operating expenses into the registry of the trial court.  Stephens testified that the amount paid into
the registry was approximately $130,000. 
Stephens also said that she did not know what needed to be deducted from
Eldridge=s report,
but was confident that Frank=s
counsel would let her know.  Eldridge
testified that he did not know whether Frank was entitled to an offset.  He also stated that he did not know what
amount of money was in the registry, whether the expense charges were
legitimate, nor did he know what Stephens=
balance was at the time the suit was filed. 









The right to
offset is an affirmative defense and the burden of pleading and proving the
facts necessary to support offset are on the party making the assertion.  See Brown v. American Transfer & Storage
Co., 601 S.W.2d 931, 936 (Tex. 1980); Rauscher Pierce Refsnes, Inc. v.
Great Southwest Sav., F.A., 923 S.W.2d 112, 117 (Tex.App.--Houston [14th
Dist.] 1996, no writ).  The elements
necessary to prove a suit on a sworn account are:  (1) a sale and delivery of goods or services;
(2) the charges on account are just, i.e., prices are charged in accordance
with agreement or, in absence of agreement, are usual, customary, and
reasonable prices for that good or service; and (3) the amount remains
unpaid.  Tex.R.Civ.P. 185; Andrews v. East Texas Medical
Center--Athens, 885 S.W.2d 264, 266 (Tex.App.--Tyler 1994, no writ).

We conclude that
Frank failed to prove his affirmative defense. 
It was not enough to prove that Stephens stopped paying the expenses and
deposited the money in the registry of the trial court.  Frank had to prove that the charges were
legitimate and that he was entitled to the money deposited with the court.  Frank did not introduce any invoices he
claimed were unpaid.  He did not file a
verified pleading, or submit any evidence, proving the elements of his suit on
a sworn account.  Tex.R.Civ.P. 185; Andrews, 885 S.W.2d at 266.  In addition, we point out that the jury
specifically found that Stephens had not breached the operating
agreements.  Frank has not attacked this
finding on appeal.  Thus, we conclude
that the jury impliedly found against Frank on his offset defense.  Accordingly, this complaint is overruled.

ATTORNEY=S FEES

In his fifth point
of error, Frank complains that there is no evidence or insufficient evidence to
support the jury=s award
of $1.4 million in attorney=s
fees.  He asserts that Stephens= attorney gave conflicting testimony
regarding the fees incurred.  In
addition, Frank argues that the fees were not segregated by cause of action or
by defendant.  Finally, he contends that
the attorney=s fees
are not rationally related to the amount in controversy.








As a general rule,
the party seeking to recover attorney=s
fees carries the burden of proof.  Stewart
Title Guar. Co. v. Sterling, 822 S.W.2d 1, 10 (Tex. 1991); Aetna Cas.
& Sur. v. Wild, 944 S.W.2d 37, 40 (Tex.App.--Amarillo 1997, writ
denied).  Factors that a fact finder
should consider when determining the reasonableness of a fee include:  (1) the time and labor required, the novelty
and difficulty of the questions involved, and the skill required to perform the
legal service properly; (2) the likelihood that the acceptance of the
particular employment will preclude other employment by the lawyer; (3) the fee
customarily charged in the locality for similar legal services; (4) the amount
involved and the results obtained; (5) the time limitations imposed by the
client or by the circumstances; (6) the nature and length of the professional
relationship with the client; (7) the experience, reputation, and ability of
the lawyer or lawyers performing the services; and (8) whether the fee is fixed
or contingent on results obtained or uncertainty of collection before the legal
services have been rendered.  Arthur
Andersen & Co. v. Perry Equipment Corp., 945 S.W.2d 812, 818 (Tex.
1997).

First, we will
address Frank=s challenge
to the sufficiency of the evidence.  His
challenge rests primarily on the fact that Stephens=
attorney gave conflicting testimony about the amount of attorney=s fees incurred.  He also contends that the amount awarded
includes fees for matters that are not related to Stephens= breach of contract claim.  

The record
reflects that Stephens=
attorney, Jad Davis, testified to the reasonable and necessary attorney=s fees attributable to the breach of
contract action.  First, he testified to
his own background, education, and experience. 
He then explained the eight factors for evaluating the reasonableness
and necessity of attorney=s
fees.  See Arthur Anderson & Co.,
945 S.W.2d at 818.  Davis made available
a box of invoices and expense summaries supporting his testimony.  Davis then identified the attorneys and legal
assistants who worked on the case, and reviewed the work done.








Davis testified
that $2,160,089.28 represented the reasonable and necessary attorney=s fees and expenses Aattributable to claims for which
recovery of attorney=s
fees are allowed.@  He 
explained that the hourly rates charged to Stephens were actually below
the rate he typically charged other clients. 
Later, Davis corrected his figure by subtracting the expenses for expert
witnesses and investigators from the original amount.  The new figure was $1,750,000.  On cross-examination, Davis stated that the
reduced figure represented the fees which potentially were recoverable.  He explained that the $1,750,000 figure
included $250,000 in fees that were not billed to Stephens, but could have been
billed if he had charged her at his regular rate.  Later, Davis was recalled and testified that
the $1,750,000 figure was attributable to the fees incurred on the breach of
contract claim only.  During
cross-examination, he stated that the fees incurred for the whole case were
$3,000,000.  

Frank=s attorney, Greg Ackels, testified that
the Casses had incurred reasonable and necessary attorney=s fees of approximately $1,300,000
defending against all of the claims brought by Stephens.  In addition, he stated that they had incurred
expenses of $400,000.  Ackels opined that
the correct amount of Stephens=
attorney=s fees,
attributable to her contract claim, was $200,000.  He further stated that Stephens should not
recover any attorney=s
fees because her claim was frivolous. 








Obviously, the
jury did not give full credit to Davis=s
testimony since they awarded Stephens $1.4 million instead of the requested
$1.75 million.  In addition, it should be
equally self-evident that the jury rejected Ackels=
testimony.  Considering the entire
record, we cannot agree that there is a lack of evidence to support the jury=s award.  Davis testified at length about the work done
on the case.  He recounted the long
discovery battle and the numerous hearings held to procure documents.  He opined that the defendants had engaged in
a deliberate attempt to prevent Stephens from ever getting to trial.  The jury was well aware that the case was
eleven years old at the time of trial.  

In addition, the
procedural history of this case includes multiple mandamus actions, two
appeals, weeks of discovery hearings, a twenty-one day hearing on the motion to
suppress evidence and the motion for sanctions, a two day hearing on the motion
to disqualify Eldridge, numerous pretrial motions, eight motions for summary
judgment, four motions for continuance by the Casses, and a nineteen day
trial.  The record literally weighs in
favor of Stephens= position

--with over 9,000 pages of reporter=s record and over 3,000 pages of clerk=s record--there is more than a
scintilla of evidence to support Stephens=
claim.  Having considered the evidence in
the light most favorable to the jury=s
verdict, we conclude that there is legally sufficient evidence to support the jury=s award.  Having considered all of the evidence, we
conclude that there is factually sufficient evidence to support the jury=s award.  Accordingly, we overrule Frank=s sufficiency challenges.








We pause to
respond to Frank=s
complaint that the award includes fees and expenses incurred on matters not
related to Stephens= breach
of contract claim.  The record does not
support Frank=s
position.  First, the jury=s award does not include fees for
probating General Stephens=
will.  Davis testified that $83 was
included for securing certified copies of General Stephens= last will and testament.  The copies were used to prove title during
the trial.  Second, the award does not
include fees for litigation in Dallas County. 
Davis testified that he did not include any amounts for unrelated
lawsuits.  Specifically, Davis stated
that the fees for litigation in Dallas County were not included in the written
summary of the fees requested by Stephens, and Ackels agreed.  Third, the award does not include fees for an
alarm system or for wells and leases unrelated to this case.  Davis testified that the requested fees did
not include an amount for an alarm system and did not cover any unrelated wells
or leases.  

Davis=s testimony is the only evidence
concerning the fees included in Stephens=
request.  Frank has not brought forth any
evidence that contradicts Davis=s
testimony.  We conclude that Frank=s complaints about unrelated fees are
unfounded and lack merit.  Frank
presented his theory to the jury, and they rejected his argument.  Under the facts and circumstances presented,
we have no authority to interfere in the jury=s
resolution of the conflicts in the evidence or its assessment of the
credibility of the witnesses. 
Accordingly, we overrule his complaints.

 
          Next, we consider Frank=s complaint that the fees were not
segregated by cause of action or by defendant. 
When a party seeks to recover attorney=s
fees, he must show that the fees were incurred on a claim that allows recovery
of such fees and, thus, is ordinarily required to segregate fees incurred on
claims allowing recovery of fees from those that do not.  Sterling, 822 S.W.2d at 10.  The party must segregate fees by claim and by
defendant when there are multiple defendants which may or may not be
responsible for the fees, or when there are multiple claims which may a or may
not allow the recovery of such fees.  Id.
at 10-11.  When the claims are Adependent upon the same set of facts or
circumstances and thus are >intertwined
to the point of being inseparable,=
the party suing for attorney=s
fees may recover the entire amount covering all claims.@  Sterling, 822 S.W.2d at 11; Stewart
Title Guar. Co. v. Aiello, 941 S.W.2d 68, 73 (Tex. 1997).








Here, Davis
testified that the request for attorney=s
fees related to Stephens=
breach of contract claim only.  In
question number twenty-eight, the jury was asked to find the reasonable and
necessary attorney=s fees
attributable to Frank=s
failure to comply with the operating agreements.  Logically, Frank would be the only defendant
liable for the breach of the operating agreements since the jury found that he
was the operator under those agreements. 
As a consequence, we conclude that the fees were appropriately
segregated by claim and by defendant. 
Accordingly, we overrule Frank=s
complaint.

Finally, we
address Frank=s
contention that the attorney=s
fees are excessive when compared to the amount in controversy.  The jury found Frank liable for $586,162.17
in damages on Stephens=
breach of contract claim.  Frank argues
that the amount of attorney=s
fees are more than twice the amount of the damages and, thus, they are excessive.  We disagree. 
Considering the facts and circumstances of this case, we conclude that
the attorney=s fees
are reasonable and necessary.  This case
has been in litigation for fourteen years. 
The record is long and detailed. 
The discovery process was exhaustive and caused Stephens to spend large
amounts just to obtain the documents and information that support her
claim.  There is nothing simple about
this case and the parties have fought over every point imaginable.  We conclude that the jury=s award is not excessive.  Consequently, we overrule Frank=s fifth point of error.                

EXEMPLARY
DAMAGES

During the
punitive damage stage of trial, the jury awarded Stephens $5 million for Frank=s fraudulent actions, $15 million for
Frank=s
malicious conversion, and $20 million for Michael=s
malicious conversion.  Stephens
voluntarily remitted $2.5 million of the award for Frank=s
fraud, $12.5 million for Frank=s
malicious conversion, and $17.5 million for Michael=s
malicious conversion.  On appeal, Frank
attacks the legal and factual sufficiency of the evidence to support the jury=s fraud finding.  Frank and Michael also attack the sufficiency
of the evidence to support the jury=s
malice findings.  They also complain that
the jury=s awards
were excessive.  We will consider the
sufficiency challenges and then the excessiveness complaints.








Sufficiency
of the Evidence

First, Frank
asserts that there can be no award of punitive damages without a finding that
he intentionally committed fraud against Stephens.  He argues that there is no evidence or
insufficient evidence to support a finding that he intentionally committed
fraud.  See Sears, Roebuck & Co.
v. Meadows, 877 S.W.2d 281, 282 (Tex. 1994)(intent to defraud is a
necessary element of a fraud claim); Bennet v. Howard, 141 Tex. 101, 170
S.W.2d 709, 712 (1943) (exemplary damages are recoverable for fraud).  Because we have already determined that there
is both legally and factually sufficient evidence to support the jury=s finding of fraud against Frank, we
overrule his complaint.  








Second, Frank and
Michael contend that there is no evidence or insufficient evidence to support
the jury=s
findings that they maliciously converted Stephens=
property.  A party may recover exemplary
damages when it proves that property was converted with malice.  See George Thomas Homes, Inc. v. Southwest
Tension Systems, Inc. 763 S.W.2d 797, 800 (Tex.App.--El Paso 1988, no
writ).  Malice may be shown by proof of
either actual malice or implied malice.  Id.  Actual malice is characterized by ill‑will,
spite, evil motive, or purposing the injuring of another.  Implied or legal malice, on the other hand,
exists when wrongful conduct is intentional and without just cause or
excuse.  See Continental Coffee
Products Co. v. Cazarez, 937 S.W.2d 444, 452 (Tex. 1996).  Because this action was filed on November 4,
1986, we will not apply the heightened clear and convincing evidence standard
when we review the factual sufficiency of the evidence to support the malice
findings.  See Moriel, 879 S.W.2d
at 31-2 (declining to adopt clear and convincing evidence standard); Act of
April 26, 1995, 74th Leg., R.S., ch. 19, ''
1-2, 1995 Tex.Gen.Laws 108-113
(adopting clear and convincing evidence standard for cases filed on or after
September 1, 1995; current version at Tex.Civ.Prac.&Rem.Code
Ann. '
41.001(2), ' 41.003
(Vernon 1997)).  The standard for
reviewing a legal sufficiency challenge remains unchanged whether we apply a
heightened burden of proof or not.  See
In re B.R., 950 S.W.2d at 119. 

The evidence
clearly shows that Frank and Michael converted jointly-owned equipment for
their own use and benefit.  The evidence
also shows that they converted the equipment with actual malice.  First, there is the evidence that the Casses
attempted to conceal their bad acts. 
Eldridge testified that the accounting procedures began to disintegrate
after the General terminated his partnership with Frank.  He also related that the Casses failed to
provide the Gruy auditors with many of the documents which disclosed the
unauthorized equipment transfers and the gross overbilling of the joint
accounts for equipment the joint owners already owned or for equipment they
never received.  The evidence shows that
Frank attempted to destroy many of the documents that traced the equipment
transfers and bogus charges by throwing them in the trash.  Eldridge testified that without the
documents, he would not have been able to reconstruct many of the transfers and
charges.  The trash documents included
original copies of operating agreements, handwritten notes by Frank and Michael
concerning the transfers and bogus charges, and invoices and transfer orders
signed by both men.  Second, there is the
evidence that Frank and Michael later sold their interests in the Cass
companion wells to a third party for $12 million.  Third, there is the evidence that they
generally resisted and attempted to delay trial of this case for approximately
ten years.








The jury was free
to infer malicious intent from the facts and circumstances presented.  It was certainly reasonable for the jury to
infer that the numerous:  failures to
give credit; the double billings for equipment already owned; and the billings
for equipment and expenses never used by the joint interest owners, was not just
fortuitous or accidental.  The jury
reasonably could have inferred that Frank and Michael deliberately and
intentionally acted to benefit their own interests at the expense and detriment
of the joint interest owners.  As a
consequence, we conclude that there is legally sufficient evidence to support
the malice findings.








Next, we address
Michael=s
complaint that Eldridge was not competent to give expert opinions regarding
malice.  He asserts that Eldridge=s testimony is the only evidence
supporting the malice findings.  He
argues that Eldridge=s
testimony was not supported by any evidence and that Eldridge was not qualified
to give an opinion regarding whether the Casses defrauded, cheated, or stole
from the joint interest owners.  We
disagree.  First, Eldridge=s testimony is not the only evidence
supporting the malice findings.  The
record reflects that numerous documents were admitted into evidence, showing
the transfer of equipment without credits and the bogus charges made to the
joint accounts.[5]  Second, this evidence clearly is the basis
for Eldridge=s report
and his testimony.  Third, Eldridge was
clearly qualified to give an opinion regarding whether the Casses intentionally
converted the joint interest owners=s
equipment.  Eldridge was competent to
opine about the accounting procedures employed, and the actual accountings
made, by the Casses.  He reviewed
transfer orders signed by both Frank and Michael, the handwritten notes of both
men, and was well aware of the role Michael played in the business.  Eldridge=s
opinion that Frank and Michael intentionally defrauded, cheated, and stole from
the joint interest owners is supported by evidence and is certainly a
reasonable inference to be drawn from the evidence presented.  We overrule Michael=s
complaint.         

  Finally, we address the factual sufficiency
of the evidence.  Frank relies on the
evidence: that he sometimes paid vendors with his own money when the joint
interest owners were late paying their bills; that he waited patiently for
three years for the joint interest owners to elect a new operator; that he
procured a new operator when the joint interest owners would not; and that the
operating agreements authorized him to move the joint equipment between the
jointly-owned wells.  He argues this
evidence proves his lack of malice.  This
evidence was presented to the jury and they impliedly rejected Frank=s version of the events.  Having considered all of the evidence, we
conclude that the jury=s
verdict is not so contrary to the overwhelming weight of the evidence as to be
clearly wrong or manifestly unjust. 
Frank=s
complaint is overruled.  

Michael relies on
the evidence that the JOAs authorized the movement of the equipment.  He also asserts the evidence shows that he
was just following his father=s
orders and was unaware of the accounting errors.  Again, this evidence was presented to the
jury and was rejected.  There is evidence
which shows that Michael was intimately involved in the daily affairs of Cass
Oil Company, Inc.  For a period of time, he
served as field supervisor.  When he
returned to Dallas, he was involved in allocating expenses between wells.  His name appears on transfer orders and
invoices.  Considering all of the
evidence, the jury was free to infer that Michael did more than just follow his
father=s
orders.  We again note that the operating
agreements only authorized the operator to purchase jointly-owned equipment;
there was no authorization for the equipment to be taken without compensation.  We conclude that there is factually
sufficient evidence to support the malice finding.  Michael=s
complaint is overruled.

 








Excessiveness

Frank and Michael
complain that the jury=s
awards are excessive under Texas and federal law.  Specifically, they argue that the punitive
damage awards are not rationally related to the actual damages.  They assert that the awards are the product
of passion and prejudice, and violate substantive due process protections
against excessive punitive damage awards. 


We disagreed in
our original opinion and affirmed the punitive damage award.  The Texas Supreme Court denied Appellants= Petition for Review, but Certiorari
was granted by the U.S. Supreme Court. 
Our original opinion was vacated and remanded to us for reconsideration
in light of the Court=s
decision in State Farm Mutual Automobile Ins. Co. v. Campbell, 123 S.Ct.
1513, 155 L.Ed2d 585 (2003).  Campbell
held that the award of excessive punitive damages in that case violated the Due
Process Clause.  

In this case, the
punitive damage to compensatory damage ratios are approximately twenty-five to
one.  The jury assessed $101,300.92
against Frank as damages for his fraudulent conduct, and $98,780.82 against
Frank and Michael jointly and severally as damages for their malicious
conversion.  After remittitur, the
punitive damage awards are $2.5 million per defendant per each cause of action.








The evidence
regarding the nature of the wrong and the character of the conduct involved has
already been thoroughly discussed. 
Stephens presented evidence that Frank defrauded the joint interest
owners and converted their equipment for his own personal gain.  The evidence also shows that Michael
participated, aided, and abetted his father in defrauding the joint interest
owners and converting their equipment. 
Culpability for these actions can lie nowhere but with Frank and
Michael.  Regarding the sensibilities of
the parties concerned, Frank ran a corporation which handled $30 million of
business during the two-year Gruy audit period, whereas Stephens was a
housewife unacquainted with the oil and gas business.  Stephens produced evidence that General
Stephens was unable to handle his financial affairs during the years after he
terminated his partnership with Frank. 
Eldridge testified that the accounting procedures began to decline after
the partnership terminated.  He concluded
that Frank and Michael had attempted to take advantage of the General and Mrs.
Stephens by systematically inflating the joint interest billings, by making
fraudulent expense charges, and by converting the jointly-owned equipment.

The Supreme Court
continues to follow the benchmarks it earlier established in BMW of North
America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)
for determining whether a punitive damages award is unconstitutionally
excessive:  (1) the degree of
reprehensibility of the defendant=s
misconduct; (2) the disparity between actual and punitive damages; and (3) a
comparison of the punitive damages awarded and other civil or criminal
penalties that could be imposed for similar misconduct.  See Campbell, 123 S.Ct. at 1515;
BMW, 517 U.S. at 574‑75, 116 S.Ct. at 1598-99; see also, TXO Prod.
Corp. v. Alliance Resources Corp., 509 U.S. 443, 462, 113 S.Ct. 2711, 125
L.Ed.2d 366 (1993); Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 20‑21,
111 S.Ct. 1032, 1043-44, 113 L.Ed.2d 1 (1991). 








We continue to
believe the acts of the defendants in this case constitute such
reprehensibility as to warrant the imposition of further sanctions.  The facts found by the jury show that Frank
and Michael intentionally and deliberately defrauded and converted the property
of the joint interest owners for their own personal benefit.  Fraud and conversion are ancient wrongs which
are roundly denounced and receive little public sympathy.  Here, the facts are egregious and show a
deliberate attempt by both men to escape responsibility for their wrongful
conduct.  Considering the
reprehensibility of the conduct and the ratios together, we conclude that the
jury=s
punitive awards are not unreasonable.  We
do note, however, that the harm suffered by the plaintiffs was economic rather
than physical which would be a militating factor in the award of punitive
damages.  Campbell, 123 S.Ct. at
1516.

Turning then to
the second guidepost of relationship between the harm and the punitive damages
award, Campbell, while eschewing any Abright-line
tests,@ does
seem to establish a single digit multiple range when it states that in most
cases due process will be violated if the punitive award is more than nine
times the amount of the compensatory award. 
Campbell, 123 S.Ct. at 1524. 
Furthermore, when the compensatory damages are substantial, then a
lesser ratio could Areach the
outermost limit of the due process guarantee.@  Id. at 1516.

We now consider
the last BMW factor, the sanctions for comparable misconduct.  First, we observe that the criminal law
punishes the theft of property, in the amounts converted here, as a
third-degree felony.  See Tex.Pen.Code Ann. ' 31.03(e)(5)(Vernon Supp.
2004-05)(theft of over $20,000 but under $100,000).  In Texas, a third-degree felony is punishable
by a jail sentence of not more than 10 years or less than 2 years and a
possible fine of up to $10,000.  See Tex.Pen.Code Ann. ' 12.34 (Vernon 2003).

Taking all
relevant considerations into account, we conclude that the punitive damages
award to plaintiffs exceeds the amount tolerable under the Due Process
Clause.  We further conclude that because
there were sizable economic damages and other sanctions noted below that the
circumstances and context of this case do not merit a ratio that exceeds four
to one.  Ergo, we find that a ratio of
punitive to compensatory damages of three to one is constitutionally permissible.








The jury assessed
compensatory damages of $101,300.92 against Frank and $98,780.82 against Frank
and Michael jointly and severally.  An
appropriate amount of punitives against Frank individually is $300,000, and
against Frank and Michael jointly and severally is $300,000.   We find it only necessary to review the
federal claim because it is dispositive. 
Issue three is sustained. 

SANCTIONS

In his sixth point
of error, Frank complains that the trial court abused its discretion by  imposing sanctions against him.  The trial court awarded Stephens $978,492.10
as damages for Frank=s
discovery abuses.  The trial court=s judgment includes eighteen findings
regarding the abuses by Frank and the justness of the trial court=s award.  On appeal, Frank complains that the award
does not comport with the standards set by the Supreme Court.  See TransAmerican Natural Gas Corp. v. Powell,
811 S.W.2d 913, 917 (Tex. 1991); Braden v. Downey, 811 S.W.2d 922 (Tex.
1991).  Specifically, he argues that the
award is unjust and excessive.








A trial court may
impose sanctions on any party that abuses the discovery process.  See Tex.R.Civ.P.
215.  The discovery sanctions imposed by
a trial court are within that court=s
discretion and will be set aside only if the court clearly abused its
discretion.  Bodnow Corp. v. City of
Hondo, 721 S.W.2d 839, 840 (Tex. 1986). 
The sanctions imposed must be just. 
Powell, 811 S.W.2d at 917. 
To determine whether an imposition of sanction is just, we consider
whether:  (1) there is a direct
relationship between the offensive conduct and the sanction imposed; and (2)
whether the sanction is excessive.  Id.  A trial court abuses its discretion if the
sanction it imposes does not further one of the purposes that discovery
sanctions were intended to further.  Bodnow
Corp., 721 S.W.2d at 840; Cap Rock Elec. Cooperative, Inc. v. Texas
Utilities Elec. Co., 874 S.W.2d 92, 99-100 (Tex.App.--El Paso 1994, no
writ).

Frank asserts that
the trial court abused its discretion by awarding unjust and excessive
sanctions, however, he has not attacked any of the trial court=s findings of fact.  The judge=s
findings of fact are reviewable for legal and factual sufficiency of the
evidence to support them, by the same standards which are applied in reviewing
the legal or factual sufficiency of the evidence to support jury findings.  Anderson v. City of Seven Points, 806
S.W.2d 791, 794 (Tex. 1991); Cap Rock Elec.Cooperative, Inc., 874 S.W.2d
at 97.  By failing to attack the trial
court=s
findings, Frank has waived any complaint regarding the sufficiency of the
evidence to support those findings.  Simon
v. Watson, 539 S.W.2d 951, 959 (Tex.Civ.App.--Waco 1976, writ ref=d n.r.e.).  Accepting the trial court=s findings as true and correct, we now
consider Frank=s
complaint.

The record
contains over 4,000 pages of reporter=s
record dedicated to the numerous hearings on Stephens=
motion for sanctions.  Over the course of
thirteen months, the trial court heard several weeks of testimony from more
than eighty witnesses regarding Frank=s
discovery abuses.  In its final judgment,
the trial court specifically found that Frank: 
(1) abused the discovery process; (2) failed to comply with discovery
requests; (3) violated the court=s
discovery orders; and (4) systematically destroyed relevant files and
records.  The court then noted that it
had tested less stringent sanctions against Frank, and that less stringent
sanctions would not be effective in this case. 
The court also found that Frank=s
discovery abuses created an onerous burden to the court, and that Frank
exhibited flagrant bad faith and callous disregard for his responsibilities
under the rules of procedure.  The trial
court=s
judgment shows that it considered both TransAmerican Natural Gas Corp.
and Braden when it imposed the sanctions.








Frank contends
that his conduct did not prejudice Stephens. 
First, he asserts that Stephens already had copies of the trash
documents, and that the documents were produced to the Gruy auditors.  We disagree. 
One, there is no proof that Stephens had a copy of the documents that
were thrown away.  Two, Stephens put on
evidence showing that the trash documents were not produced to Gruy.  Next, Frank asserts that Stephens was not
prejudiced because the General agreed that the records could be destroyed.[6]  We disagree. 
First, we point out that the trash documents were covered by a discovery
order regardless of whether the General agreed to destroy an extra set of those
documents.  Second, we note that the operating
agreements required the operator to maintain a copy of the joint account
records.  Thus, Frank had a duty as
operator to maintain a copy of the records regarding the joint accounts
regardless of the agreed destruction of the documents held in storage.  

Finally, Frank
complains that the sanctions create a double recovery because the award
includes damages attributable to attorney=s
fees.  We disagree.  Mr. Davis testified that the reasonable and
necessary attorney=s fees
for the whole case were $3 million.  The
jury awarded Stephens $1.4 million for the breach of contract claim alone.  Considering the numerous motions, the
numerous hearings on Stephens=
discovery requests, the weeks of hearings on the motion for sanctions, and the
appeal of the sanctions order, we conclude that the award of attorney=s fees was just.








In summary, we
conclude that the trial court did not abuse its discretion by imposing
sanctions.  The evidence shows that Frank
failed to comply with Stephens=
discovery requests, that he violated the court=s
discovery orders, and that he destroyed discoverable documents and
records.  The record also contains
evidence that Stephens incurred considerable expenses in recovering the trash
documents and in pursuing Frank=s
compliance with the rules of procedure. 
We conclude that the sanctions were just as both a punishment for Frank=s bad faith conduct and as a future
deterrent against such conduct.  The
sanctions were directly related to the offensive conduct and were not excessive
considering the time, effort, and expense incurred by Stephens.  Accordingly, we overrule Frank=s sixth point of error.

CONCLUSION

In summary, we
conclude that the trial court did not err by admitting Eldridge=s testimony or by imposing
sanctions.  Further, we conclude that
there is legally and factually sufficient evidence to support the jury findings
except for punitive damages.  We affirm
the judgment of the trial court except that we reform the judgment to provide
for punitive damages of $300,000 against defendant Frank Cass, and $300,000
against defendants Frank Cass and Michael Cass.   

 

 

August
31, 2004

DAVID
WELLINGTON CHEW, Justice

 

Before Panel No. 3

Barajas, C.J., Larsen, and Chew, JJ.











[1]
These complaints involve arguments contained within Frank=s Point of Error 4, and Michael=s Points of Error 3, 4, and 6.





[2]
Apparently, these exhibits consist of four boxes of notebooks containing
invoices, material transfer orders, and other documents supporting Eldridge=s conclusions.





[3]
This challenge involves a portion of Frank=s
fourth point of error, and Michael=s
first, second, and third points of error.





[4]
The record does not include most of the exhibits relied upon by Eldridge.  It seems that the jury considered Plaintiffs= Exhibits 1223 through 1243 in
determining that Frank overcharged Stephens for expenses charged by affiliated
companies.





[5]
Plaintiff=s
Exhibits 1202A-1202TTT and 1219A-C, are not a part of the record.  These exhibits consist of many of the
invoices, material transfer orders, and other documents which back up Eldridge=s conclusions.  





[6]
The record includes a letter signed by the General and Frank, wherein they
authorized Security Archives, Inc., to destroy a number of boxes of documents
which the company had in its possession. 
Frank testified that he and the General each had their own copies of the
documents that were to be destroyed.